**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

April 7, 2019

By ECF and E-Mail

Hon. Eric N. Vitaliano
Senior U.S. District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    United States v. Cantoni, 18 Cr. 562 (ENV)

Dear Judge Vitaliano:

    A review of the transcripts of April 4's mid-trial discussion and April 5's charge conference, in combination with the discovery produced to the defense, reveals troubling questions about the government's assertions:

    (1) regarding the circumstances of its mid-trial disclosure of *Brady* material showing that the defendant was excluded as a match for a fingerprint found on one of the demand notes; and,

    (2) that it has now discharged its obligations to fully disclose *Brady* and Rule 16 material.

    Based on the facts set forth below, the defense moves for an immediate order that the government provide <u>all</u> reports of these three robberies in the NYPD files (all sections of the NYPD) to the defense prior to the re-commencement of trial, and for the opportunity to question the three primary witnesses regarding the non-disclosure of this fingerprint exclusion (Ramirez, Van Eyken and Giuca) outside of the presence of the jury prior to their testimony.

1

## Factual Background

As far as the government has now revealed, the NYPD possessed – and the defense did not receive – at least three different categories of information concerning the exclusion of Mr. Cantoni as a match to the Queens fingerprint:

1) an entire fingerprint file created on 9/17/18 by Cynthia Ramirez -- the same NYPD Latent Print examiner who had analyzed the palm print found on the note in another bank robbery in the same case just 5 days earlier and had concluded that the palm print matched Mr. Cantoni's. The fingerprint exclusion file for the Queens note includes an upload of the print into the ABIS system and search record, and a specific notation that Detective Van Eyken had requested the print be compared against suspect Greg Cantoni's prints. *See* Exhibit A (Queens Note Fingerprint File).

2) DD-5s completed on 9/18/18 and 9/23/18 by Detective Van Eyken, who had requested the fingerprint on the Queens note be compared specifically to Mr. Cantoni's as a "suspect." The DD5 completed on 9/23/18 states that Detective Van Eyken learned from Examiner Ramirez that Mr. Cantoni had been specifically excluded as the person who left the print on the note. *See* Exhibit B (Van Eyken DD-5s)

3) information that the arresting officer, Detective Giuseppe Giuca, who testified in the grand jury and testified at trial *prior* to the *Brady* disclosure, knew that Mr. Cantoni had been excluded as a match to the fingerprint on the Queens' note.

This material was first disclosed to the defense, as *Brady* material, on April 3 and 4, 2019, in the midst of Mr. Cantoni's jury trial.

### Fingerprint File

Beginning in November 2018, and continuing up to trial, the defense made both a general discovery and *Brady* request, *see* Dkt. #12, and repeated, specific, discovery requests for all information pertaining to fingerprints as to any of the three robberies. These requests included:

2

- a specific discovery demand on January 16, 2019 for "information related to the fingerprint identification analysis performed by the New York City Police Department ("NYPD") Latent Print Section." Dkt. #15, at 1.
- a specific discovery demand on January 16, 2019, for "Electronic images of any and all 'latent' prints (prints recovered as evidence in this case) entered into AFIS and/or ABIS in standard (.eft or .wsq) format." Dkt. #15, at 2.
- a specific discovery demand on January 16, 2019, for "the results of any and all AFIS and/or ABIS searches run in connection with this case." *Id.*
- a motion to compel, on February 6, 2019, discovery of "unredacted copies of the NYPD Latent Print Section (LPS) examiner case files" and of "contemporaneous bench notes of the examinations conducted in this case." Dkt. #16, at 1.

The government represented in a letter to the Court that "the full electronic file from the Latent Print Section has been provided to defense counsel." Dkt. 17, at 3.

Significant subsequent litigation ensued regarding fingerprint evidence in this case, including a *Daubert* motion, cross-motions to exclude fingerprint experts, and a *Brady* request for a candidate list. *See, e.g.*, Dkt. ## 24, 29, 30, 33, 34. Thus, there could have been no question that any fingerprint evidence related to this case was critical to the defense.

The defense received materials in discovery and 3500 concerning the Queens note fingerprint identification, but nothing regarding its analysis or comparison:

- Detective Van Eyken's September 11, 2018, laboratory examination request for a latent print examination to be conducted on the Queens note (not produced in discovery; first produced on March 25, 2019, as 3500-PV-18, and attached as Exhibit C);

- A laboratory report prepared by Criminalist Patricia Zippo on September 12, 2018, who, after analyzing the words and handwriting on the three demand notes, indicates that she is forwarding the Queens demand note to the Latent Print Section

3

      for analysis (produced in discovery as Cantoni_22, again produced as Cantoni_3039, and attached here as Exhibit D);

- a three-page report by Criminalist Tiffany Garcia (who processes but does not compare latent prints) prepared on September 17, 2018, and produced in discovery, indicating that a latent print of potential value had been found on the Queens note and referring it to the latent print section for analysis. (Cantoni 3050-52, now in evidence as Defense Exhibit N, and attached here as Exhibit E).

- In addition, when defense counsel viewed the actual Queens demand note for the first time on March 28, 2019 at the U.S. Attorney's Office, Criminalist Garcia's identification of a latent print of value was visible to the naked eye on the front of the Queens note (marked by her initials TAG and the number 1). (*See* Photograph of Queens Note taken March 28, 2019, attached as Defense Exhibit F.) The note was in the custody of case agent David Bonacarti, a NYPD Detective.

Based on the government's representation that all Latent Print Section materials had been produced, it was the defense's understanding that the fingerprint of potential value on the Queens note had never subsequently been compared by the latent print section.

      Late in the evening of April 3, 2019, in the middle of trial, the defense received, as a *Brady* disclosure, the Latent Print Section file concerning the fingerprint found on the Queens note. That file indicates, *inter alia*, that on September 18, 2018 fingerprint examiner Ramirez had been asked by Detective Van Eyken (with his cell phone number noted in the fingerprint file) to specifically compare the fingerprint to "suspect Cantoni, Greg P. NYSID #05411938Z". *See* Exhibit A, at 2 -3 and 14. Ramirez conducted that comparison and excluded Mr. Cantoni as a match. *Id.* at 2-3. The examiner issued a report to that effect dated September 24, 2018. *Id.*, at 3. That report specifically instructs that elimination prints of all persons having legitimate access to the scene must be submitted for comparison purposes, and lists this fingerprint as an open case. *Id.* That file contains the exact same print cards for Mr. Cantoni as the Staten Island print file, analyzed by Examiner Ramirez five days previously, does.

4

### DD-5s

The defense, after receiving the 3500 material for Detective Van Eyken on March 22, 2019, explicitly noted to the government that the material for this particular witness seemed extremely sparse, and asked the government to check for additional reports and any notes either written by Detective Van Eyken, or taken by the case agent or the government in meetings with Detective Van Eyken.  The government represented that they had again checked and that all reports had been produced, and that no such notes existed, including not a single note taken by the AUSAs or case agent in any meeting or conversation with Detective Van Eyken.  The defense renewed this request for additional 3500 material for Detective Van Eyken at the final pre-trial conference, on April 29, 2019, and the government again represented that all 3500 material for Detective Van Eyken had been requested, received, and disclosed.

Minutes before the trial day began on April 4, 2019, the government disclosed two DD-5s by Detective Van Eyken to the defense that the government said it had just received that morning.  The first DD-5, dated September 18, 2018, states that Detective Van Eyken called the latent print section to find out which latent print examiner had been assigned to analyze the Queens fingerprint, and includes the information that examiner Ramirez had been assigned.  *See* Exhibit B, at 1.  The second DD-5, dated September 23, 2018, states that Detective Van Eyken spoke to Examiner Ramirez and learned that the fingerprint was not a match to Mr. Cantoni.  *See id.*  Both DD-5s have on the bottom a line of text indicating when they were printed from the NYPD's Electronic Case Management System: that line indicates they were printed on 3/20/19, 15 days before they were disclosed to the defense as *Brady* material.  *See id.*

### The Government Has Made Conflicting Representations to the Court.

On April 3, 2019, after the defense elicited from Criminalist Garcia the existence of this latent print of potential value on the Queens note, and introduced into evidence her report, the government immediately asked to break early for the day and wait to call its next witness, the latent print examiner, Cynthia Ramirez, who was waiting outside the courtroom,

5

because of "some issues ... to work out with a file." 4/3/19 Tr. at 407. The government refused to provide any further information. *Id.*

On April 4, 2019, after the *Brady* disclosure, prior to the commencement of the trial day, A.U.S.A. David Lizmi gave a partial explanation to the Court of the circumstances of the *Brady* discovery. A.U.S.A. Lizmi asserted that the government had only become aware of the fingerprint exclusion and the DD-5s pertaining to it the night before – April 3, 2019 – because:

> "Since the inception of this case, we've been requesting all files related to this case from the NYPD. On February 22nd, we followed up prior to trial to make sure that we had everything and what we received -- we requested the full files and what we received was represented to be the full files and we turned those over on March 4th." (4/4/19 Tr. at 420-21).

The defense understood both from that statement to the Court and from its discussions before court with the prosecutors that the prosecutors had explicitly requested the entire files on these three bank robberies as late as February 22, 2019, had been told they had received the full files, and learned only on April 3, 2019, that this was not true. Defense counsel was further informed by the prosecutors prior to court that both Detective Giuca and Detective Van Eyken had acknowledged to the government on April 3, 2019, that they were aware of the exclusion of Mr. Cantoni as a match to the print, had not previously provided that information to the prosecutors, and would "fall on their swords" if called to testify about it at trial.

At the charge conference the next day, the government took a very different tack:

A.U.S.A. Lizmi made the blanket assertion: "there is no evidence that anyone has ... concealed anything here." 4/5/19 Tr. at 616.

Soon thereafter, in contradiction of A.U.S.A. Lizmi's statement just the day before that the government had requested full NYPD files as recently as February 22, 2019, A.U.S.A. Aganga-Williams affirmatively represented to the Court that the last date on which the government had pulled DD-5s from the NYPD system was September 17, 2018, the day

6

before Detective Van Eyken filed a DD-5 concerning the Queens bank robbery note fingerprint.  A.U.S.A. Aganga-Williams went on to represent that if the government had requested or pulled DD-5s even six days later (September 23, 2018), it would have had the relevant DD-5s regarding the Queens note and fingerprint in its file and produced them to the defense:

> MR. AGANGA-WILLIAMS:
> "This is just, your Honor, terrible timing. You have September 17, the U.S. Attorney's Office takes possession of these DD5s, those have been produced to defense counsel. That date is on there. September 18 and another date after that is when these events happened. Detective Vaneyken uploads this information to the NYPD system. So the suggestion that there is any kind of concealment is contrary to what is clear on the face, he's uploading the documents and reporting this in a normal function of the NYPD." (4/5/19 Tr. at 634)
>
> ....
>
> "Without offering justifications, I think if the timing were different by a matter of six days or so, the information would have been available to everyone in the same fashion, including U.S. Attorney's Office and defense counsel. And in a better world we wouldn't be where we are now; but unfortunately that's not what happened. ....To be frank, your Honor, the information -- the DD5s were pulled with a simple pull, that's how these things are done. (4/5/19 Tr. at 636).

Your Honor then explicitly asked A.U.S.A. Aganga-Williams whether, if the prosecutors had requested DD-5s on October 1st 2018, these two DD5s (concerning the Queens print) would have been disclosed previously with the other discovery. (4/5/19 Tr. at 637.)

A.U.S.A. Aganga-Williams answered "That's correct, your Honor," and went on to explain:

> "The problem is that when the U.S. Attorney's Office takes over the case, the presumption is that investigatory steps taken by the original agency, here the NYPD, are end[ed]." (4/5/19 Tr. 637, 640.)

7

### The Government's Representations Also Conflict with Discovery Provided to the Defense

A.U.S.A. Aganga-Williams' explanation that the U.S. Attorney's Office and its NYPD case agent had pulled no DD-5s from the NYPD case file, in which all three robberies are linked, subsequent to September 17, 2018, because they had no idea that the NYPD was still working on the case, both contradict A.U.S.A. Lizmi's explanation of April 3, 2019, and seems unlikely on its face.

The grand jury minutes reflect that on October 18, 2018 – one month after the government took over the case – this was not so and the government knew it: A.U.S.A. Lizmi explicitly asked Detective Giuca "is this investigation still ongoing?" Detective Giuca responded "Yes, it is." (3500-GG-33, at 13).

And the government's explanation of the terrible timing also necessarily means that the case agent did not check the NYPD files again for the next seven months, including when 3500 was being produced – and these prosecutors neither directed him to do so nor did so themselves.[1]

Defense counsel, therefore, has reviewed again the discovery productions, this time with an eye to the time-line of when certain discovery was obtained by the government or its case agent.

That review shows there were DD-5s produced that are marked on the bottom of each page as downloaded from the NYPD system on September 17, 2018. But there are also DD-5s produced that are marked on the bottom of each page as downloaded from the NYPD Electronic Case Management system almost two months later, **on November 8, 2018**. *See, e.g.,* Exhibit G, attached (produced to the defense on November 28, 2018). The Electronic Case Management System keeps all DD5s and other case documents developed during an investigation in one electronic file.

Thus: it is not true that there was a single pull of DD-5s on September 17, 2018. The government also pulled NYPD detective reports in November,

---

[1] Moreover, on March 27, 2019, defense counsel personally observed the case agent log onto the case file at his desk and retrieve the voucher for Mr. Cantoni's money, taken at the time of arrest, making clear the case agent had access to the NYPD case file.

well after the fingerprint exclusion DD-5s were filed by Detective Van Eyken in the NYPD Electronic Case Management System.

In addition, at the charge conference, A.U.S.A. Aganga-Williams specifically represented to the Court that the government had first "identified" the two Van Eyken DD-5s concerning the Queens print on April 3, 2019, and he had read them "for the first time" on April 4, 2019, ten minutes before they were given to defense counsel. Those DD-5s, handed to the defense by Mr. Aganga-Williams, and attached as Exhibit B here, have a line on the bottom showing they were obtained by someone from the NYPD's Electronic Case Management System on March 20, 2019.

### **The Government Has Failed To Meet Its Disclosure Obligations.**

The mandate of Rule 16(a)(1)(E) is clear: "Upon a defendant's request, the government must permit a defendant to inspect ... the results or reports ... of any scientific test .. if ... the attorney for the government knows – <u>or through due diligence could know</u> – that the item exists and ... the item is material to preparing the defense."

The mandate of *Brady* and *Giglio* is equally clear and needs no request by the defendant to be mandatory upon a prosecutor: the prosecution has an affirmative duty to seek out and turn over any evidence favorable to the defendant, whether it exculpates the defendant, or calls into question his guilt in some other way, including calling into question the credibility of a police officer. *See Kyles v. Whitley*, 514 U.S. 419 (1995); *Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963). The prosecutor is not excused from this constitutional duty because the information is in its police officers' files, and not the U.S. Attorney's Office files. *See Kyles*, 514 U.S. at 437; *Giglio*, 405 U.S. at 154.

Here, the prosecution failed to exercise any diligence whatsoever. Apparently, Detective Giuca, before testifying before the grand jury, was never asked if there was any evidence that negated the defendant's guilt as to any of the three robberies. Despite the defense's repeated requests for any and all fingerprint evidence related to this case, the prosecution never asked for the results of the latent print examination on the Queens note, even though the prosecution had in its possession – and produced in discovery -- multiple pages of information from different sources indicating that the note had been sent for latent print examination.

This happened in a case where fingerprint evidence was clearly material, indeed critical, and where the government was preparing as its own witnesses the very law enforcement officers who possessed this information about the print and its exclusion: Tiffany Garcia; Cynthia Ramirez; Paul Van Eyken; and Giuseppe Giuca.

This failure is contrary to the Department of Justice's own principles on disclosure of forensic evidence, as well as the basic tenets of our criminal justice system, which relies on the prosecution to obtain and disclose both inculpatory and exculpatory information.

Indeed, the Department of Justice's own manual states:

"It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." *Justice Manual*, 9-5.001, Policy Regarding Disclosure of Exculpatory and Impeachment Information, at A.2.

"This search duty also extends to information prosecutors are required to disclose under Federal Rules of Criminal Procedure 16 and 26.2 and the Jencks Act." Criminal Resource Manual, Department of Justice Guidance for Prosecutors Regarding Criminal Discovery, Step 1.

In addition, the Department of Justice requires its prosecutors to disclose "substantial evidence that directly negates the guilt of a subject of the investigation" to the grand jury before seeking an indictment. *See* Justice Manual, 9-11.233, Presentation of Exculpatory Evidence.

"The Department's policy to provide discovery over and above the minimum legal thresholds applies to cases with forensic evidence." *Justice Manual*, at 9-5.003. That Manual then specifically directs how the discovery should be obtained and disclosed in order to meet the Department of Justice's policies of broad disclosure:

> "Although prosecutors generally should consult with forensic experts to understand the tests or experiments conducted, <u>responsibility for disclosure ultimately rests with the prosecutor assigned to the case</u>." *Id.*

Specifically, it does not appear that the government made any effort – let alone a heightened effort – to comply with Mr. Cantoni's specific demands for "the fingerprint identification analysis performed by the New York City Police Department ("NYPD") Latent Print Section" and "any and all 'latent' prints (prints recovered as evidence in this case) entered into AFIS and/or ABIS in standard (.eft or .wsq) format." Dkt. #15, at 2. The Queens fingerprint file falls squarely within the defense's several specific requests because it contains both a latent print recovered in evidence in this case and an ABIS search record related to this case – created by the same examiner just five days after she matched the partial palm print to Mr. Cantoni on the Staten Island note. It defies common sense that examiner Ramirez would not mention the Queens print to the prosecutors in the course of witness preparation, and would not pull the Queens file -- if she had actually been asked by the government for all latent prints identified in this case.

Similarly, when the government or its case agent pulled the NYPD reports on November 8, 2018 (examples attached as Exhibit F), Detective Van Eyken's reports regarding the Queens fingerprint were already in the case file, and the government ignored them. So too subsequently, in March 2019, when the 3500 was created, which places a specific obligation on the government to seek out all prior statements of the witness – *i.e.,* for the case agent to go on the electronic file and review the documents and disclose all prior statements relating to the case.

The defense notes that Detective Van Eyken's 3500 material *did include* some new statements not previously provided in discovery, which would tend to indicate that additional documents were obtained from the NYPD – from this very witness – in the 3500 process, just not these DD-5s that contained exculpatory information. When the defense again asked, including on the record, whether it had all 3500 of Detective Van Eyken, the government represented that it had gone back and checked, and there were no further reports and no notes. Furthermore, when the government prepared Detective Van Eyken to testify, it apparently never asked to review his case file or asked him questions regarding the Queens note that he had personally recovered from the bank and his request for latent print

examination – which was part of his 3500 – that would have enabled them to discover that the exclusion of Mr. Cantoni had been made and that these DD-5s existed. This is incomprehensible, especially given that the case agent is a veteran NYPD officer.

The government has provided no explanation for these failures. Negligence is not an excuse under *Brady*; due diligence is required to protect the defendant's right to a fair trial.

**Requested Remedies**

The government's lack of due diligence in this case and its misrepresentation to the Court that "terrible timing" caused this Rule 16, *Brady* and 3500 violation, and that if only the government had accessed NYPD documents after September 17, 2018, it would never have occurred, gives rise to a grave concern to the defense that there are still outstanding documents and other *Brady* or *Giglio* information that the defense has not received. At the same time as incorrectly stating that the government had not received any reports from the NYPD since September 17, 2018, the government also assured the Court that the defense has now received all information concerning the nondisclosure of the exclusion of Mr. Cantoni as a match to the Queens fingerprint. The concern that this statement is also incorrect is only heightened by A.U.S.A. Aganga-Williams' response to this Court's inquiry at the charge conference as to whether the defense has now received everything in the NYPD files related to the three bank robberies: "there is not an open discovery policy." (4/5/19 Tr. at 629.)

The defense has also still not received, despite repeated requests, a single case note taken by Detective Van Eyken, or taken by the case agent and prosecutors in interviewing Detective Van Eyken.

"[A] prosecutor who learns of a *Brady* failure must have incentive to work with the court to remedy the violation rather than, as was done here, to ask only that the failure be forgiven and forgotten. The effectiveness of our system requires more: As an inscription in the alcove outside the Attorney General's Office reads, "The United States wins its point whenever justice is done its citizens in the courts." *United States v. Pasha*, 797 F.3d 1122, 1141 (D.C. Cir. 2015).

12

So that Mr. Cantoni may receive the fair trial to which he is entitled by our Constitution, the defense asks that the Court: (1) direct the government to produce every document in NYPD files (all NYPD sections) related to the three robberies to the defense prior to the re-commencement of trial on Monday, April 8, 2019; and (2) hold a hearing on Monday morning outside of the presence of the jury at which Detectives Ramirez, Van Eyken and Guica testify under oath as to how this breakdown occurred, who received notification, and how, and what discovery and 3500 requests they received from the case agent and prosecution. *See, e.g., Burke*, 571 F.3d at 1054 ( "Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial." ).

After full discovery and a hearing, once the defense has a full and accurate understanding of how this breakdown occurred and whether or not the government has fully complied with its obligations, the defense may renew, if warranted, its request for additional curative remedies, such as an instruction to the jury, or other, stronger, relief.

                                        Respectfully Submitted,
                                            /s/
                                        Allegra Glashausser
                                        Deirdre D. von Dornum
                                        Attorneys for Greg Cantoni

cc:   David J. Lizmi
       Temidayo Aganga-Williams
       Jack Dennehy
       Jacquelyn Kasulis
       Greg Cantoni